**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROCHE CYRULNIK FREEDMAN LLP,<br><br>        Plaintiff,<br><br>    v.<br><br>JASON CYRULNIK,<br><br>            Defendant. | Case No. 1:21-cv-01746-JGK<br><br>**DEFENDANT'S CORRECTED ANSWER TO PLAINTIFF'S AMENDED COMPLAINT AND COUNTERCLAIMS** |
| JASON CYRULNIK,<br><br>            Counterclaim-Plaintiff,<br><br>    v.<br><br>ROCHE CYRULNIK FREEDMAN LLP, KYLE ROCHE, DEVIN FREEDMAN,<br>AMOS FRIEDLAND, NATHAN HOLCOMB, and EDWARD NORMAND,<br><br>            Counterclaim-Defendants. | |

## ANSWER

Defendant Jason Cyrulnik, by and through his undersigned attorneys, Kasowitz Benson Torres LLP, hereby answers the amended complaint (the "Amended Complaint") filed by Plaintiff Roche Cyrulnik Freedman LLP ("RCF") as follows:

1.    Cyrulnik denies the allegations of Paragraph 1.

2.    Cyrulnik admits the allegations of Paragraph 2.

3.    Cyrulnik is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 3, and otherwise denies the allegations of Paragraph 3.

4. Cyrulnik admits that he signed the MOU, refers to the MOU for its contents, and otherwise denies the allegations of Paragraph 4.

5. Cyrulnik denies the allegations of Paragraph 5, other than to admit that RCF's scheme to remove him for "cause" and take the extremely valuable assets belonging to him are improper, null and void, and states that RCF's lawsuit is without merit.

6. Cyrulnik denies the allegations of Paragraph 6.

7. Cyrulnik admits the allegations of Paragraph 7.

8. Cyrulnik admits the allegations of Paragraph 8.

9. Cyrulnik states that Paragraph 9 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 9.

10. Cyrulnik states that Paragraph 10 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 10.

11. Cyrulnik states that Paragraph 11 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 11.

12. Cyrulnik is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 12, and otherwise denies the allegations of Paragraph 12.

13. Cyrulnik is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 13, and otherwise denies the allegations of Paragraph 13.

14. Cyrulnik is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 14, admits that RCF was given Tokens by the START UP, a portion of which Tokens were earmarked for and guaranteed to Cyrulnik in connection with the MOU, and otherwise denies the allegations of Paragraph 14.

15.     Cyrulnik admits that Roche and Freedman approached Cyrulnik about joining RF and that Roche and Freedman negotiated an agreement to have Cyrulnik join together with them as the three named partners of RCF, that Edward Normand, Amos Friedland, and Nathan Holcomb would join RCF as founding partners, and states that he is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 15, and therefore denies them.

16.     Cyrulnik states that the allegation that the prospective partners discussed and agreed to "a variety of things" is vague and ambiguous, admits that he and the other Founding Partners negotiated the terms of the MOU, refers to the MOU for its contents, and otherwise denies the allegations of Paragraph 16.

17.     Cyrulnik admits that he and the other Founding Partners executed the MOU, which memorialized portions of the agreement reached, refers to the MOU for its contents, and otherwise denies the allegations of Paragraph 17.

18.     Cyrulnik refers to the MOU for its contents, admits that a long-form partnership agreement had not yet been executed at the time Counterclaim-Defendants executed their scheme, and otherwise denies the allegations of Paragraph 18.

19.     Cyrulnik refers to the MOU for its contents, and otherwise denies the allegations of Paragraph 19.

20.     Cyrulnik refers to the MOU for its contents, and otherwise denies the allegations of Paragraph 20.

21.     Cyrulnik admits that Roche sent an email on July 22, 2020, refers to that email for its contents, and otherwise denies the allegations of Paragraph 21.

22.     Cyrulnik admits that the Tokens substantially increased in value to be worth millions of dollars at the beginning of 2021 and that five of RCF's seven equity partners conspired to improperly remove him without cause in an effort to steal his valuable assets, including his allocation of the Tokens, and otherwise denies the allegations of Paragraph 22.

23.     Cyrulnik refers to the MOU for its contents, and otherwise denies the allegations of Paragraph 23.

24.     Cyrulnik refers to the MOU for its contents, and otherwise denies the allegations of Paragraph 24.

25.     Cyrulnik refers to the MOU for its contents, states that he is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the "understanding" of the other Founding Partners, and otherwise denies the allegations of Paragraph 25.

26.     Cyrulnik refers to the MOU for its contents, states that he is without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the "understanding" of the other Founding Partners other than to deny that the allegations comport with the other Founding Partners' verbal statements, and otherwise denies the allegations of Paragraph 26.

27.     Cyrulnik refers to the MOU for its contents, and otherwise denies the allegations of Paragraph 27.

28.     Cyrulnik denies the allegations of Paragraph 28.

29.     Cyrulnik denies the allegations of Paragraph 29.

30.     Cyrulnik denies the allegations of Paragraph 30.

31.     Cyrulnik denies the allegations of Paragraph 31.

32. Cyrulnik admits that he and Roche discussed concerns over Freedman's abuse of RCF's compensation system, and that his conversations concerning those concerns were civilized, and otherwise denies the allegations of Paragraph 32.

33. Cyrulnik denies the allegations of Paragraph 33.

34. Cyrulnik denies the allegations of Paragraph 34.

35. Cyrulnik denies the allegations of Paragraph 35.

36. Cyrulnik admits that Roche sent an email on July 22, 2020 and refers to the email for its contents.

37. Cyrulnik admits that Freedman sent an email on July 27, 2020 and refers to that email for its contents.

38. Cyrulnik denies the allegations of Paragraph 38.

39. Cyrulnik denies the allegations of Paragraph 39.

40. Cyrulnik denies the allegations of Paragraph 40.

41. Cyrulnik denies the allegations of Paragraph 41.

42. Cyrulnik denies the allegations of Paragraph 42.

43. Cyrulnik denies the allegations of Paragraph 43.

44. Cyrulnik denies the allegations of Paragraph 44.

45. Cyrulnik denies the allegations of Paragraph 45.

46. Cyrulnik denies the allegations of Paragraph 46.

47. Cyrulnik denies the allegations of Paragraph 47.

48. Cyrulnik denies the allegations of Paragraph 48.

49. Cyrulnik denies the allegations of Paragraph 49.

50. Cyrulnik denies the allegations of Paragraph 50.

51.    Cyrulnik denies the allegations of Paragraph 51.

52.    Cyrulnik denies the allegations of Paragraph 52.

53.    Cyrulnik denies the allegations of Paragraph 53.

54.    Cyrulnik denies the allegations of Paragraph 54.

55.    Cyrulnik denies the allegations of Paragraph 55.

56.    Cyrulnik denies the allegations of Paragraph 56.

57.    Cyrulnik admits that Katherine Eskovitz sent an email, refers to that email and the related chain of emails for their contents, and otherwise denies the allegations of Paragraph 57.

58.    Cyrulnik denies the allegations of Paragraph 58.

59.    Cyrulnik denies the allegations of Paragraph 59.

60.    Cyrulnik denies the allegations of Paragraph 60.

61.    Cyrulnik denies the allegations of Paragraph 61.

62.    Cyrulnik denies the allegations of Paragraph 62.

63.    Cyrulnik denies the allegations of Paragraph 63.

64.    Cyrulnik denies the allegations of Paragraph 64.

65.    Cyrulnik admits, upon information and belief, that Roche, Freedman, Friedland, Holcomb, and Normand held a secret meeting without informing two of RCF's seven equity partners, including Cyrulnik, to vote in an attempt to improperly remove Cyrulnik and steal his assets on or about February 10, 2021, and otherwise denies the allegations of Paragraph 65.

66.    Cyrulnik admits, upon information and belief, that Roche, Freedman, Friedland, Holcomb, and Normand held a secret meeting without informing two of the RCF's seven equity partners, including Cyrulnik, to vote in an attempt to improperly remove Cyrulnik and steal his assets on or about February 10, 2021, and otherwise denies the allegations of Paragraph 66.

67.    Cyrulnik admits that Roche sent an email on February 12, 2021, refers to that email for its contents, and otherwise denies the allegations of Paragraph 67.

68.    Cyrulnik admits that he spoke with Roche, Freedman, and Normand on February 12, 2021, admits that he demanded that RCF retract its improper notice and commit to remitting to him everything owed to him under his agreements with RCF and the Conspiring Partners, and otherwise denies the allegations of Paragraph 68.

69.    Cyrulnik admits that he has identified the Counterclaim-Defendants' attempted removal for cause as pretextual and that the Conspiring Partners perpetrated their scheme in an effort to steal Cyrulnik's assets including to "recapture" his share of the Tokens, which "exponentially rose in value" during the weeks prior to the attempt, and otherwise denies the allegations of Paragraph 69.

70.    Cyrulnik admits that he has disputed RCF's and the Conspiring Partners' improper attempt to remove him in violation of the parties' agreements, which attempt was and is null and void, and that Marc Kasowitz, Cyrulnik's counsel, sent an email to counsel for RCF, refers to that email for its contents, and otherwise denies the allegations of Paragraph 70.

71.    Cyrulnik admits that the Counterclaim-Defendants improperly cut his access to his email account as well as the client files, electronic systems, bank accounts, and health insurance abruptly at various points throughout February 2021, admits that his counsel sent an email to RCF on or about February 26, 2021, refers to the email for its contents, and otherwise denies the allegations of Paragraph 71.

72.    Cyrulnik admits that his counsel sent an email to RCF on or about February 26, 2021, refers to the email for its contents, and otherwise denies the allegations of Paragraph 72.

73.     Cyrulnik is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 73, and otherwise denies the allegations of Paragraph 73.

74.     Cyrulnik is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 74, and otherwise denies the allegations of Paragraph 74.

75.     Cyrulnik admits that RCF's counsel sent an email to Cyrulnik's counsel on or about March 24, 2021, refers to that email for its contents, and otherwise denies the allegations of Paragraph 75.

76.     Cyrulnik admits that his counsel sent an email to RCF's counsel on or about March 26, 2021, refers to that email for its contents, and otherwise denies the allegations of Paragraph 76.

77.     Cyrulnik states that Paragraph 77 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 77.

78.     Cyrulnik denies the allegations of Paragraph 78.

79.     Cyrulnik denies the allegations of Paragraph 79.

80.     Cyrulnik denies the allegations of Paragraph 80.

81.     Cyrulnik is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 81, and otherwise denies the allegations of Paragraph 81.

82.     Cyrulnik is without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 82, and otherwise denies the allegations of Paragraph 82.

83.     Cyrulnik repeats and realleges his responses to the allegations contained in Paragraphs 1 through 82 as if fully set forth herein.

84.     Cyrulnik states that Paragraph 84 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 84.

85.     Cyrulnik states that Paragraph 85 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 85.

86.     Cyrulnik states that Paragraph 86 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 86.

87.     Cyrulnik admits that he is an equity partner of RCF and disputes that he was removed from RCF for cause, and otherwise denies the allegations of Paragraph 87.

88.     Cyrulnik states that Paragraph 88 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 88.

89.     Cyrulnik states that Paragraph 89 contains legal conclusions to which no response is required, otherwise denies the allegations of Paragraph 89, and states that RCF is entitled to no relief whatsoever.

90.     Cyrulnik repeats and realleges his responses to the allegations contained in Paragraphs 1 through 89 as if fully set forth herein.

91.     Cyrulnik states that Paragraph 91 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 91.

92.     Cyrulnik states that Paragraph 92 contains legal conclusions to which no response is required.

93.     Cyrulnik states that Paragraph 93 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 93.

94.     Cyrulnik states that Paragraph 94 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 94.

95.     Cyrulnik states that Paragraph 95 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 95.

96.     Cyrulnik denies the allegations of Paragraph 96.

97.     Cyrulnik states that Paragraph 97 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 97.

98.     Cyrulnik states that Paragraph 98 contains legal conclusions to which no response is required, otherwise denies the allegations of Paragraph 98, and states that RCF is entitled to no relief whatsoever.

99.     Cyrulnik states that Paragraph 99 contains legal conclusions to which no response is required, otherwise denies the allegations of Paragraph 99, and states that RCF is entitled to no relief whatsoever.

100.    Cyrulnik repeats and realleges his responses to the allegations contained in Paragraphs 1 through 99 as if fully set forth herein.

101.    Cyrulnik admits that he originated certain clients as a partner of RCF, states that Paragraph 101 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 101.

102.    Cyrulnik states that Paragraph 102 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 102.

103.    Cyrulnik states that the Paragraph 103 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 103.

104.    Cyrulnik states that Paragraph 104 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 104.

105.    Cyrulnik denies the allegations of Paragraph 105.

106.    Cyrulnik states that Paragraph 106 contains legal conclusions to which no response is required, and otherwise denies the allegations of Paragraph 106.

107. Cyrulnik states that Paragraph 107 contains legal conclusions to which no response is required, otherwise denies the allegations of Paragraph 107, and states that RCF is entitled to no relief whatsoever.

108. Cyrulnik states that Paragraph 108 contains legal conclusions to which no response is required, otherwise denies the allegations of Paragraph 108, and states that RCF is entitled to no relief whatsoever.

To the extent a response is required, Cyrulnik denies each allegation contained in the "WHEREFORE" clause of the Amended Complaint and states that RCF is entitled to no relief whatsoever.

## **AFFIRMATIVE DEFENSES**

By alleging the Affirmative Defenses set forth below, Cyrulnik does not agree or concede that he bears the burden of proof or the burden of persuasion on any of these issues, whether in whole or in part.

### FIRST AFFIRMATIVE DEFENSE

RCF has failed to plead an entitlement to the relief it seeks.

### SECOND AFFIRMATIVE DEFENSE

RCF's claims fail, in whole or in part, to state a cause of action for which relief may be granted.

### THIRD AFFIRMATIVE DEFENSE

RCF's claims are barred, in whole or in part, by RCF's failure to satisfy conditions precedent.

<u>FOURTH AFFIRMATIVE DEFENSE</u>

RCF's claims are barred, in whole or in part, by RCF's fraudulent conduct.

<u>FIFTH AFFIRMATIVE DEFENSE</u>

RCF's claims are barred, in whole or in part, because none of the alleged acts or omissions by Cyrulnik were the proximate cause or the actual cause of the injuries or damages allegedly sustained by RCF.

<u>SIXTH AFFIRMATIVE DEFENSE</u>

RCF's claims are barred, in whole or in part, because any injuries or damages allegedly sustained by RCF were the result of intervening or supervening events, factors, occurrences, or conditions, not proximately caused by Cyrulnik and for which Cyrulnik is not liable.

<u>SEVENTH AFFIRMATIVE DEFENSE</u>

RCF has not sustained any legally cognizable damages or injuries caused by any matter alleged against Cyrulnik in the Amended Complaint.

<u>EIGHTH AFFIRMATIVE DEFENSE</u>

To the extent that RCF suffered any damages (which Cyrulnik denies), any such damages must be reduced as a result of RCF's failure to take reasonable steps to mitigate damages.

<u>NINTH AFFIRMATIVE DEFENSE</u>

RCF's claims are barred, in whole or in part, under the doctrines of waiver, laches, equitable estoppel, and unclean hands.

<u>TENTH AFFIRMATIVE DEFENSE</u>

RCF's claims are barred, in whole or in part, by documentary evidence.

<u>RESERVATION OF ADDITIONAL AFFIRMATIVE DEFENSES AND RIGHTS</u>

Cyrulnik gives notice that he intends to rely on any affirmative defenses that are now or may become available in this action, through discovery or otherwise, and reserve his right to amend this Answer to assert any such defenses.

## COUNTERCLAIMS

Counterclaim-Plaintiff Jason Cyrulnik, for his counterclaims against counterclaim-defendants Kyle Roche, Devin Freedman, Amos Friedland, Nathan Holcomb and Edward Normand (the "Conspiring Partners") and Roche Cyrulnik Freedman LLP (a/k/a Roche Freedman LLP) ("RCF" or the "Firm" and, together with the Conspiring Partners, "Counterclaim-Defendants"), upon knowledge as to Cyrulnik and otherwise upon information and belief, alleges as follows:

## INTRODUCTION

1.      This action arises from a deplorable scheme orchestrated by two lawyers, Roche and Freedman, to illegally steal extraordinarily valuable assets by purporting to oust Cyrulnik from the firm they jointly founded, RCF, so that they could try to take for themselves Cyrulnik's rightful share of the Firm, including an enormously valuable Firm asset — a fee payable in cryptocurrency by one of the Firm's clients that ████████ had suddenly appreciated exponentially to more than $250 million.  The Firm's governing agreement expressly prohibits the removal of a Founding Partner without cause, so Roche and Freedman, together with certain other partners they secretly recruited to their scheme and to whom they agreed to provide a share of Cyrulnik's assets, concocted an absurd and purely pretextual "cause" — their principal claim that Cyrulnik had raised his voice during two telephone conversations months earlier — and then, jeopardizing Cyrulnik's ability to represent his clients in active ongoing litigation, they cut

13

his access to the Firm's client files, emails, electronic systems and bank accounts, and terminated his and his family's access to the Firm's health insurance.

2.    What makes Counterclaim-Defendants' greedy and unlawful scheme even more egregious is that it was perpetrated by two inexperienced lawyers — Roche and Freedman — who had spent months recruiting and convincing Cyrulnik, a highly accomplished lawyer with a long-standing, robust and growing practice, to leave his equity partnership at a prominent national law firm to transform their fledgling firm into a stable and respected litigation practice. They convinced Cyrulnik to do so based on their commitment, also reflected in the agreement governing the Firm, that, in exchange for contributing his thriving practice to the Firm, Cyrulnik would benefit from precisely the kind of upside Counterclaim-Defendants are now trying to steal.

3.    Roche, who graduated law school in 2016, and Freedman, who graduated in 2012, had met Cyrulnik while Roche and Freedman were junior associates and Cyrulnik was an equity partner at the prominent law firm of Boies Schiller Flexner LLP ("BSF").  Counterclaim-Defendants Roche and Freedman left BSF in the summer of 2019 to start their own small firm focusing on cryptocurrency and other specialized practice areas.  Shortly thereafter, realizing that they needed an experienced lawyer with an established and successful practice and cash flow to fund the firm's operations and help procure lead counsel appointments in their class-action cases, they approached Cyrulnik about his leaving BSF to join them and co-found RCF.  After fifteen years at BSF and months of active recruitment by Roche and Freedman, Cyrulnik agreed to found a law firm with Roche and Freedman in January 2020.  As the Conspiring Partners knew, in doing so, Cyrulnik was leaving his highly profitable equity partnership at BSF and forgoing lucrative offers to join other national law firms.  As the Conspiring Partners also knew, Cyrulnik

did so in reliance on the negotiated and unambiguous terms of the new Firm's governing agreement that provided him with fixed, guaranteed, and significant equity interests in the new Firm's contingency and alternative fee matters, with substantial financial upside.

4.      Cyrulnik became the lynchpin of the Firm, managing and running the Firm's largest cases and core client base, and his practice, which Counterclaim-Defendants needed to sustain the Firm while the contingency and other alternative fee arrangements they had entered into with clients could come to fruition, accounted for more than 60% of the Firm's revenue and roughly 70% of the Firm's profits in 2020.

5.      Then, in late ▇▇▇▇ 2021, the value of one of the alternative fee arrangements in which Cyrulnik held a significant (25%) interest suddenly experienced tremendous growth, and ▇▇▇▇▇▇▇▇▇▇ in ▇▇▇▇ 2021, skyrocketed by $200 million to a value of more than $250 million, with Cyrulnik's 25% share reaching a value exceeding $60 million.

6.      Notwithstanding months of reaffirming their admiration for Cyrulnik and his enormous contributions to the Firm's success, the Conspiring Partners seized on this unexpected and sudden development to concoct a scheme to try to deprive Cyrulnik of his share of the cryptocurrency and keep it for themselves.  To circumvent the threshold hurdle of their scheme – that the parties' agreement expressly barred removing Cyrulnik, as a Founding Partner, without cause, and clearly and unambiguously granted Cyrulnik 25% of the cryptocurrency – Roche and Freedman manufactured transparently false grounds to remove him for "cause."  Alleging that Cyrulnik raised his voice on two phone calls concerning certain questionable actions Roche and Freedman (and two other partners) had taken that threatened to endanger the Firm, the Conspiring Partners claimed that Cyrulnik suddenly somehow lost the guaranteed equity and cryptocurrency interests expressly granted to him by the parties' agreement.  They then invited

handpicked partners – the other Conspiring Partners – to a secret meeting, excluding anyone they knew would not participate in their improper scheme. At the secret meeting, the Conspiring Partners held a self-serving "vote" to "remove" him from the Firm. They then took the position that Cyrulnik was no longer entitled to the cryptocurrency and other interests expressly granted to him by the parties' agreement – even though nothing in the agreement provides for such a forfeiture.

7.     Counterclaim-Defendants compounded their egregious misconduct by seeking to pressure clients to stay with them rather than continue to have Cyrulnik represent them. That scheme failed miserably: a mass exodus of those clients ensued, as they wanted Cyrulnik to lead their litigations. At the same time, the Firm's other equity partner, Paul Fattaruso, rebuffed Counterclaim-Defendants' requests to continue working with them in the wake of the scheme they had perpetrated.

8.     Counterclaim-Defendants' unconscionable misconduct is in flagrant violation of their contractual, fiduciary, and ethical duties to Cyrulnik and their professional responsibilities to the Firm's clients. Cyrulnik's conduct was consistently exemplary, in contrast to several Conspiring Partners (whose missteps Cyrulnik was addressing in the very discussions about which they now complain and seek to use as the purported basis for their scheme), including with respect to Roche's lax attitude toward billing practices and timekeeping and Freedman's problematic referral-fee arrangements with other firms.

9.     Accordingly, Cyrulnik brings these claims seeking, among other things, dissolution of the Firm and distribution of its assets in accordance with Florida law and the parties' unambiguous governing agreement, and recovery of the damages Counterclaim-Defendants' egregious conduct has caused.

**THE PARTIES**

10.     Counterclaim-Plaintiff Jason Cyrulnik is a citizen of New Jersey and a co-founding named equity partner of RCF.

11.     Counterclaim-Defendant RCF is a Florida limited liability partnership, with offices in Miami, Florida and New York, New York.

12.     Counterclaim-Defendant Devin Freedman is a citizen of Bay Harbor Islands, Florida and a co-founding named equity partner of RCF.

13.     Counterclaim-Defendant Kyle Roche is a citizen of New York and a co-founding named equity partner of RCF.

14.     Counterclaim-Defendant Amos Friedland is a citizen of Connecticut and an equity partner of RCF.

15.     Counterclaim-Defendant Nathan Holcomb is a citizen of New York and an equity partner of RCF.

16.     Counterclaim-Defendant Edward Normand is a citizen of New York and an equity partner of RCF.

**JURISDICTION**

17.     This is an action for equitable relief and millions of dollars in damages excluding interest, attorneys' fees, and costs.

18.     Cyrulnik is filing his counterclaims in accordance with and pursuant to the Court's ruling that "[g]iven the intertwined nature of the jurisdictional question with the merits, '[t]he Court is satisfied that the appropriate way to proceed is to hear and decide the factual issues bearing on its subject matter jurisdiction, recognizing that they also implicate elements of at least one of the substantive claims.'" (ECF No. 56 at 13).

19.    The Court has personal jurisdiction because Counterclaim-Defendant RCF has an office in this District in which the Conspiring Partners regularly practice, RCF and the Conspiring Partners regularly conduct business in this District, and RCF (at the direction of the Conspiring Partners) has availed itself of this forum by bringing suit here.

## FACTS

**I.    COUNTERCLAIM-DEFENDANTS RECRUIT CYRULNIK TO LEAVE HIS MAJOR LAW FIRM AND FORGO OTHER LUCRATIVE OPPORTUNITIES AND CO-FOUND RCF**

### A.    Cyrulnik Builds A Loyal Growing Client Base And Lucrative Practice At BSF

20.    Cyrulnik graduated Yale Law School in 2004 and joined BSF.  With the exception of his time as a federal law clerk, he worked at BSF continuously for over fifteen years.

21.    Cyrulnik rose through the ranks quickly.  He was one of the youngest partners ever elected to BSF's partnership and one of the youngest members of BSF to be elected to its equity partnership.

22.    Cyrulnik's steadfast commitment to clients generated a substantial following and client base.  He has been leading bet-the-company litigations for a growing base of core clients for many years.  He has received multiple awards for his practice and work, has been invited to speak at national legal conferences, and his writings have been published in national legal publications.

23.    He also developed strong relationships with a core group of attorneys at BSF with whom he worked regularly.  He mentored associates, brought in partners in to work on his many cases, and was regularly sought after for counsel by many of his colleagues.

24.    Throughout his career, Cyrulnik has generated substantial lateral interest from law firms and recruiters.  In 2019, Cyrulnik was recruited aggressively by several major national law

18

firms who were interested in attracting a young, highly successful equity partner with a robust and growing client base to join them.

### B.    Roche And Freedman Recruit Cyrulnik To Join RCF

25.    In the summer of 2019, Roche and Freedman left BSF to start their own small law firm, Roche Freedman LLP.  Roche was a third-year associate who had extensive expertise in the cryptocurrency space.  Freedman graduated law school in 2012 and had left BSF six months after being passed over for partnership and being named counsel.  Roche and Freedman intended to pursue, among other things, cryptocurrency-related matters.

26.    Cyrulnik had interacted with both Roche and Freedman at BSF.  Indeed, Freedman regularly sought advice from Cyrulnik about how to manage cases, legal strategy, and general guidance as Freedman embarked on his new venture in 2019.

27.    During one of those discussions, Freedman asked Cyrulnik if he would ever consider leaving BSF to co-found a firm with Roche and Freedman.  Freedman had expressed admiration for years at Cyrulnik's rising success at BSF and his strong client relationships. Cyrulnik initially told Freedman that, although Cyrulnik had been presented with several attractive lateral opportunities at the time, the idea of leaving BSF to start a small law firm with two young lawyers was not something he would consider because he needed an appropriate platform (in quality and size) to service his growing client base, which was his top priority.

28.    Freedman would not take no for an answer.  He continued to press over the course of several months, ultimately bringing Roche into the conversation.  The two told Cyrulnik that, if he agreed to leave BSF to co-found a firm with them, they could launch a much larger venture and recruit an associate base that would meet Cyrulnik's many clients' needs.  In exchange for his agreement to leave BSF to co-found a firm with them, Roche and Freedman promised Cyrulnik significant stakes in what they described as their high-upside contingency work and in

certain assets that they had secured. The essential business proposition was that Cyrulnik's large, diversified practice of core clients litigating major cases would generate reliable revenue and stability that would help finance Roche and Freedman's contingency and alternative fee arrangements, including by allowing the Firm to hire associates and staff, to lease office space, and to set up infrastructure needed to support a larger platform.

29. After extensive discussions and negotiations, Cyrulnik agreed to leave BSF to co-found the Firm in exchange for certain guaranteed or fixed rights and consideration, and certain continuing rights and consideration.

### C. The Parties Negotiate And Execute The MOU

30. On December 27, 2019, RCF's Founding Partners — named partners Cyrulnik, Roche and Freedman, together with Counterclaim-Defendants Friedland, Holcomb and Normand (as defined in the MOU) — entered into a binding Memorandum of Understanding ("MOU," attached as Exhibit A) to govern their partnership and their respective rights.

31. Section II of the MOU sets forth the partners' equity positions in the Firm. In recognition of the fact that Cyrulnik had the largest practice of any of the Firm's partners and was giving up a long-standing equity partnership at a major national law firm, Cyrulnik received the largest equity share (27%). Section III of the MOU addresses the distribution of the Firm's revenue, referencing an attached "Compensation Model" that sets forth distribution methodologies for revenue earned through hourly and contingency matters. Section V of the MOU (as modified) allocates origination credit among RCF's partners for matters that were ongoing at the time of RCF's founding.

32. Section IV of the MOU lists a series of "assets" (most of which were generated between August 2019 (when Roche Freedman LLP was formed) and January 2020 (when RCF was officially launched)), excludes those assets from the Compensation Model, and instead sets

forth the agreed-upon fixed allocations of those assets to the Founding Partners in different

formulas and percentages that varied by asset.

    33.    One of the key assets allocated in the MOU was cryptocurrency (referred to as

"Tokens") that a Firm client, a startup company engaged in the cryptocurrency business (the

"Startup Client"), had agreed to convey to the Firm.  The MOU expressly granted each of the

Founding Partners a fixed allocation of the Tokens (which was to be ▮▮▮ of all Tokens issued

by the Startup Client), as follows:  Freedman, 32%; Roche, 28%; Cyrulnik, 25%; and Normand,

Friedland, and Holcomb, 5% each.

    34.    Section VI of the MOU addresses the management of the Firm.  In particular, the

parties expressly agreed that "[a] Founding Partner cannot be removed without cause."

    35.    The MOU has two separate provisions governing the departure of a partner from

the Firm.  The first, Section VI(C), entitled "Withdrawal from Firm," provides that a partner who

voluntarily elects to withdraw from the Firm within 18 months would have his or her

compensation limited to the amount to which he or she would have been entitled under the

Compensation Model, and would return his or her equity in the Firm to the other equity partners.

    36.    The second, Section VI(G), entitled "Partner Removal," expressly provides that a

"Founding Partner cannot be removed without cause."  That section also provides that, even if

cause arose for the removal of a Founding Partner, that removal would require an affirmative

vote of at least two-thirds of the Firm's equity partners.  In stark contrast to the voluntary

withdrawal provision, however, such an involuntary removal (for "cause") does *not* result in the

forfeiture of any compensation, interests, or assets owed or allocated to the Founding Partner

under the MOU.

37.     Cyrulnik, Roche, and Freedman (the "Named Partners") also signed a separate agreement in January 2020 concerning the Firm's name, among other things (the "Side Letter," attached as Exhibit B).  Given his reputation, seniority, and equity stake in the new Firm, Cyrulnik was the natural choice for the "first-named" partner.  But Roche — consumed with securing that recognition for himself — agreed to pay Cyrulnik $850,000 to allow Roche to be listed as the first named partner at RCF.  The parties also agreed on an allocation of an anticipated recovery in one major contingency matter that was being excluded from RCF's Compensation Model.  Specifically, Cyrulnik was granted a 25% interest in all recoveries realized in connection with the Firm's representation in the specified contingency matter.

38.     In sum, pursuant to the parties' agreements, Cyrulnik received the following guaranteed, fixed consideration (among other things), in addition to the compensation he would receive for the matters he originated and the work he did at the Firm:

    a.     27% of the Firm's equity, which could not be diminished at any time without his consent;

    b.     25% of the cryptocurrency Tokens from the Startup Client;

    c.     a 25% interest in a specified contingency matter; and

    d.     an $850,000 cash payment from Roche (to be paid in specified installments).

39.     In reliance on the parties' commitments and agreements, Cyrulnik agreed to leave his equity partnership at BSF and co-found RCF.

## II.     CYRULNIK'S FLOURISHING PRACTICE ENABLES RCF TO EXPAND AND SUCCEED

40.     Cyrulnik's many clients all elected to follow him from BSF to RCF.  During 2020, Cyrulnik further grew his business at a rapid pace, allowing the Firm to operate, grow and thrive based on the revenue generated by Cyrulnik's practice.  Specifically, Cyrulnik was

singlehandedly responsible for bringing in, and overseeing, approximately $7.5 million of client work — more than 60% of the Firm's 2020 revenue and roughly 70% of its profits.

41.    As Freedman stated at the end-of-year partner's meeting in January 2021 (just a few weeks before orchestrating the scheme to try and steal Cyrulnik's assets), and as Roche, Freedman and several other equity partners had repeatedly told Cyrulnik separately in the months leading up to that meeting, Cyrulnik had outperformed everyone's expectations and played an indispensable role in the Firm's success.

42.    Cyrulnik's financial contribution was in addition to his substantial contributions in helping establish the Firm's credibility, which resulted in, among other things, multiple successful appointments to serve as lead counsel in a variety of class actions.  Cyrulnik also devoted tireless efforts to managing the Firm, including overseeing its end-of-year reporting, bonus distributions, formula compensation calculations, as well as hiring, benefits administration, and office lease.  Roche and Freedman, separately and together, and as recently as January 2021 (just a few weeks before effectuating the scheme to try and steal Cyrulnik's assets), told Cyrulnik how much they enjoyed working with him to build the Firm, that they could not have built the Firm without him, that his contributions were instrumental to the Firm's success, and that his performance and accomplishments were remarkable.  Normand told Cyrulnik in or about December 2020 (less than eight weeks before participating in the scheme to try and steal his assets) that Cyrulnik was "the leader" of the Firm.

43.    While Cyrulnik exceeded his end of the bargain, most other partners fell significantly short of their business generation projections.  Certain of those partners — and Roche in particular — had spent most of their time developing major contingency cases that they maintained would bring enormous revenue to the Firm over time.  That was particularly

applicable to multiple lead counsel appointments the Firm was able to secure in reliance on the robust operation they had built in reliance on, and financed by, Cyrulnik's practice.

### III. THROUGHOUT 2020, CYRULNIK, ROCHE AND FREEDMAN WORK COLLABORATIVELY TO SET UP THE FIRM, PLAN ITS EXPANSION, AND OVERSEE ITS GROWING CASELOAD

44.     The Named Partners met regularly to discuss the Firm's administration matters. Over the course of 2020, they had hundreds of phone calls and meetings, and less than a handful of disagreements.  Roche and Freedman repeatedly expressed the view that they genuinely enjoyed the partnership they had formed, that the Firm was poised for success, and that they could not have accomplished what they had without Cyrulnik.  Freedman actually remarked to Cyrulnik during an in-person meeting in the Firm's Florida office on January 18, 2021 (three weeks before the unlawful scheme he perpetrated that is at issue in this lawsuit) that it was remarkable that there was "only one issue" on which he and Cyrulnik disagreed over the course of a full year running the Firm (referring to Freedman's effort to enrich himself at the Firm's expense through referral arrangements and other "discounts" he would apply to the Firm's revenue but not his own take on that revenue).

45.     With important limited exceptions, the three Named Partners (and the equity partnership generally) worked well together, including on firm administration issues.  Over the course of more than a year of setting up and administering a workforce of 25 employees, the Named Partners encountered two main areas on which they expressed strong differing opinions: (1) Roche's improper attitude toward client billings and his responsibilities as counsel representing class clients; and (2) Freedman's efforts to exploit the Firm's Compensation Model through referral fees and discounts designed to benefit himself at the Firm's expense.  Roche and Freedman were content to downplay such problems, or to delay resolution of the matter "for another day."  With respect to these issues, Cyrulnik expressed the view that it was important for

24

the Firm to address these issues promptly and definitively to ensure that the Firm was complying with its many obligations to clients, courts, and its attorneys, and he consistently took steps to try to ensure that the partners would do so.

## IV. CYRULNIK RAISES TWO CRITICAL ISSUES AFFECTING THE FIRM'S LONG-TERM SUSTAINABILITY

46.     As the senior member of the group meeting regularly to administer the Firm, Cyrulnik addressed serious concerns that had come to his attention regarding, among other things, Roche's billing practices and Freedman's exploitation of the Firm's Compensation Model.

### A.     Cyrulnik Asks Roche To Fix His Lax Approach To Time Keeping

47.     First, in or about April 2020, Cyrulnik was reviewing time record reports from the Firm's billing system and learned that Roche had not recorded the hours he had worked on client matters for months.  Cyrulnik reached out to Roche and asked him to remedy that serious deficiency, stressing the importance of being honest and accurate with respect to client billing. Roche apologized and told Cyrulnik that he had messed up and that he would take care of it. Roche stated that he was hiring his mother to try and "reconstruct" his time by scrolling through his emails and guesstimating time entries.  Cyrulnik was not comfortable with Roche's approach and reminded Roche that he needed to ensure that he was keeping accurate time records.  Roche exhibited a similar immature and inappropriate attitude toward client bills.  Roche boasted to Cyrulnik about his desire to "pound the lodestar" on his class-action contingency matters, stating that he wanted to hire more associates and staff attorneys to work on his contingency matters so that he could position himself to obtain a better percentage of fee awards being split with the Firm's co-counsel in class matters.  Cyrulnik was concerned about Roche's approach and again told Roche that he needed to take his obligations to clients and class representations seriously.

Freedman told Cyrulnik that his concerns about Roche were not unfounded, but that Freedman would keep Roche in line. Specifically, Freedman told Cyrulnik that Roche was dishonest, explaining that Roche was the kind of person "who will lie to your face and then beg for forgiveness if he's caught" – but Freedman stressed that he uniquely knew how to "control" Roche, and that Freedman could get Roche to do "anything I want him to do."

**B.  Cyrulnik Seeks To Correct Freedman's Efforts To Engage In Self-Dealing**

48.     Second, Freedman engaged in self-dealing by manipulating the Firm's Compensation Model to enrich himself at the Firm's expense. Specifically, Freedman struck a deal with an attorney named Brian Schall whereby Freedman unilaterally obligated the Firm to pay Schall a 20% referral fee in connection with Freedman's desire to apply for lead counsel appointments in securities class actions. Instead of paying that referral fee out of Freedman's origination credit, moreover, Freedman demanded the Firm absorb that referral fee. Freedman's non-economic, "pay to play" origination strategy put the Firm in an unsustainable financial position; namely, the Firm was paying as much as 50% of all client revenue from Freedman's clients merely to "originate" the matters, and then paying the attorneys who worked on the case as much as 45% of the remaining revenue pursuant to the Compensation Model. In other words, after paying associates and partners their shares, virtually nothing would be left to cover Firm expenses and pay partnership distributions. Incongruously, Freedman's referral scheme was not only objectionable to Roche and Cyrulnik, but also to Freedman, at least when he was not profiting himself. When partner Katherine Eskovitz sought a similar arrangement for a matter she was suggesting the Firm take on (and pay her husband a large referral fee), Freedman rejected her proposal as a "money grab," a non-starter, and wholly unacceptable. Freedman and Roche both called Cyrulnik and told him that Eskovitz was a "liability" and "a problem" who was just trying to exploit the Firm, and proceeded to blame Cyrulnik for supporting making an

26

offer to Eskovitz back in 2019.  Freedman's excessive focus on enriching himself at the expense

of the Firm's long-term sustainability was deeply concerning, as was his response.  Freedman

told Cyrulnik that Freedman's objective in life was simple: "I don't want to just be rich; I want to

be super rich."  Cyrulnik and Roche both discussed their concerns about Freedman's approach to

compensation, but Roche assured Cyrulnik that he knew Freedman well, and that although

Freedman often acted "immature" and was fixated on short-term financial upside, Roche was

committed to ensuring that the concerns Cyrulnik identified would be remedied.

### V.    THE FIRM FORGOES MILLIONS IN FEES IN EXCHANGE FOR DIGITAL TOKENS FROM THE STARTUP CLIENT

49.    Cyrulnik's many stable clients and billable hour matters substantially funded the

Firm's operations and many of the Firm's alternate fee arrangement representations of other

clients.

50.    For example, as discussed above, the Firm was retained by the Startup Client,

which planned to distribute digital cryptocurrency assets in the form of Tokens and build a

platform of decentralized assets and applications.  The purpose of the representation was to assist

the Startup Client and its officers during the growth and development of their business.

51.    Pursuant to an engagement letter, in exchange for up to $6.8 million dollars in

legal services, the Startup Client agreed to provide the Firm with a percentage distribution of all

Tokens issued by the Startup Client in connection with all future distributions.

52.    Under the engagement letter, the Firm would receive a flat percentage of all

Tokens distributed "[a]s soon as reasonably practicable and in any event, within 21 days of any

Token Distribution."  Further, under the engagement letter, the Tokens functioned as a non-

refundable advance, meaning "any unused portion of the Billable Hour Advance will expire on

the fourth anniversary of this agreement's execution."

53.     Pursuant to the MOU, the Firm agreed to distribute 25% of the Tokens to Cyrulnik, 32% to Freedman, and 28% to Roche, with the remaining 15% to be split by Friedland, Holcomb and Normand.

54.     At the time the engagement letter was signed, the Startup Client was in its development phase, no Tokens had been sold or distributed, and there was no guarantee the Startup Client would be successful or what the Tokens' value would be.  Thus, Cyrulnik's stable billable hour matters were needed to fund the attorney hours spent on the Startup Client matters.

55.     In ███████ 2020, the Startup Client issued its first block of Tokens to the public, which quickly were purchased by investors.  The sale ascribed real value to the Tokens.  More importantly though, it validated the Startup Client's technology and concept, and was an optimistic signal of the potential value of the Tokens.

## VI.     ROCHE EXPLOITS CYRULNIK'S EFFORTS TO FOCUS ON THE FIRM'S SUSTAINABILITY BY SEEKING TO PRESSURE CYRULNIK INTO SURRENDERING TOKENS IN EXCHANGE FOR ROCHE'S COOPERATION

56.     Roche understood that addressing the Firm's sustainability needs, including implementing updates to the Compensation Model to stop Freedman's exploitation, was important to Cyrulnik.  Roche had in fact repeatedly told Cyrulnik that Roche shared his concerns and desire to fix the issue to ensure the long-term sustainability of the Firm and that Freedman was out for himself too much.  To that end, Roche and Cyrulnik had worked for months to clarify the formulas used to calculate credits in the Compensation Model to try and protect against future exploitation of it, in an effort to disincentivize the practices that were problematic and in which Freedman in particular was engaged.  But when Roche presented the updates to Freedman, Freedman stated that he would not agree to the change because Freedman's own compensation was "most important" to him.

57.     In ████ 2020, shortly after the Token sale had been effected and after months of delay by Freedman claiming he was "too busy" to meet to address the concerns Cyrulnik had raised, the Named Partners finally met to discuss Freedman's abuse of the Compensation Model. Cyrulnik walked through the need to protect the Firm from exploitation and the updates that Roche and he had come up with to help accomplish that.  But when Freedman pushed back, Roche suddenly backed away from the fix he and Cyrulnik had worked so long and hard to fashion.  When Cyrulnik asked Roche what happened after the call, Roche admitted to Cyrulnik that Roche was "scared" of Freedman because Freedman "sometimes acts irrationally" and is selfish.  Roche told Cyrulnik that Roche had concluded it was not "worth it" to stand up to Freedman.  Roche told Cyrulnik that "in my experience dealing with [Freedman], it's easier just to give him what he wants."  Cyrulnik told Roche that the Firm needed to be more principled and that problems need to be addressed rather than ignored.  He told both Roche and Freedman that he believed it was critical to the Firm's success that they look beyond their own individual interests to address any vulnerabilities in the formula applications for compensation to ensure that the Firm was sustaining itself and doing so fairly.

58.     Roche is deeply engaged in the cryptocurrency industry, a topic on which he regularly speaks, researches, writes, and litigates.  Roche uniquely understood how the Startup Client's ██ 2020 Token sale foreshadowed their enormous potential value, and sensed an opportunity to dupe Cyrulnik into sacrificing his right to a portion of the Tokens.  To that end, Roche wrote to Cyrulnik following the meeting with Freedman about fixing the Firm's formulas: "I agree with the economics of the proposed formula comp. change," but then shockingly told Cyrulnik that, in order for Roche to vote consistent with what he believed was best for the Firm, Cyrulnik needed to buy his support by agreeing to pay Roche 40% of Cyrulnik's Tokens (10% of

the total Tokens): "I will not vote on any change to the formula compensation structure absent the redistribution of [] tokens contemplated in the MOU." The request came out of left field.

59. Cyrulnik recognized Roche's ploy and refused to be held hostage by Roche's demands. He flatly rejected any such change to his Token stake and explained that acting in the best interests of the Firm and making decisions designed to protect its long-term sustainability was something Roche was required to do — and that the idea of demanding compensation for honoring those duties was unjust and unethical. As shown below, this was but Roche's first attempt to divest Cyrulnik of his Tokens.

## VII. THE PARTNERS COMPLETE 2020 AND PLAN FOR AND BEGIN 2021 WITHOUT ANY MENTION OF ADMINISTRATIVE CONCERNS

60. Although there were a couple of important issues that had arisen over the course of the first year of the Firm's operations on which the partners had expressed different views (and with respect to which decisions proceeded by split votes), the partnership was generally very functional and friendly. The partners consistently touted the collegiality of the Firm in discussions with potential lateral candidates. Throughout January 2021 (in the few weeks prior to the scheme at issue in this lawsuit), the partners continued to interact as they had in the past. Freedman invited Cyrulnik to lunch when Cyrulnik's family visited Florida on January 18, 2021, and they discussed many Firm planning issues.

61. Roche and Cyrulnik discussed the Firm's office plans for the duration of their lease and hiring plans for the upcoming year, along with several other planning issues.

62. Counterclaim-Defendant Friedland reached out to Cyrulnik on January 2, 2021: "Hey Jas.- Kyle said you were working on the updated 2021 rack rates, do you mind sending when you have a draft" and then followed that up with "happy new year! Might be nice to grab a drink or coffee outdoors somewhere and catch up in person sometime soon?"

30

63.     On January 22, 2021, less than three weeks before their bad-faith "removal" ploy, Freedman was arranging to ensure that the Firm's bank accounts at Chase Bank were corrected to finally ensure that Cyrulnik was listed as a registered owner – something that Freedman was required to do when the Firm was first formed one year prior, but had delayed due to the pandemic and the requirement that the owners be present together at a Chase branch to update the accounts in person.  Cyrulnik planned to visit the bank with Freedman in Florida, but Freedman asked Cyrulnik if he could instead meet with Roche upon his return to New York the following week (less than *two weeks* before the illegal "removal" scheme) in light of a family conflict Freedman had to navigate that day.

64.     ██████, the value of the Tokens exploded.

## VIII. COUNTERCLAIM-DEFENDANTS IMPROPERLY SEEK TO EXCLUDE CYRULNIK FROM RCF TO TRY AND MISAPPROPRIATE HIS INTERESTS IN THE FIRM'S VALUABLE ASSETS

65.     In ████ 2020, the Tokens began trading publicly for the first time.  Between ████ 2020 and ████ 2020, the price of the Tokens remained relatively stable.

66.     In ████ 2021, however, the Tokens experienced a precipitous rise in value.  Between ████ 2021 and ████ 2021, the Tokens increased more than 15 times in value, with most of that appreciation occurring in the five days between ████ 2021, and ████ 2021.  The Firm's Token rights (including the total supply of Tokens released and scheduled to be released), which had limited value in ████ 2020, had soared to more than $250 million, with the overwhelming majority of that appreciation occurring in the ██ days leading up to Cyrulnik's purported "removal" for cause.

67.     Below is a chart of the Tokens' price between ████ and the day of the Conspiring Partners' secret meeting to expel Cyrulnik from the Firm:

31



68. As the chart shows, as of ▮▮▮▮▮ 2021, Cyrulnik's share of the Tokens had suddenly climbed dramatically in value, peaking at over $60 million (more than ▮▮ per Token), Roche's share was worth more than $70 million, and Freedman's share was worth more than $80 million. But that was not enough for Roche and Freedman, the latter of whom had previously remarked that his goal in life was to be "super rich."

69. Accordingly, Roche and Freedman devised a covert and unlawful operation to conspire with certain partners against Cyrulnik, including two partners with whom Cyrulnik had interacted in December regarding their violations of the Firm's agreements with litigation funder Derek Randall and misappropriation of associates from existing matters. With a perceived $60 million pot to buy votes to oust Cyrulnik, as well as 27% of the Firm's other assets at play, it did not require much substance, truth, or deliberation.

70. Violating their fiduciary duties to the Firm and Cyrulnik, both Roche and Freedman, along with Friedland, Holcomb and Normand, convened a secret meeting on or about

February 10, 2021, without even informing two of the Firm's seven equity partners, to concoct the pretext for his removal. Cyrulnik was not informed of the meeting, and was not given the opportunity to address whatever false allegations the Conspiring Partners had decided to use as a pretext for the "removal" – neither at the meeting nor at any other time prior to his purported (and unlawful) "removal."

71.     Also excluded from the covert meeting was equity partner Paul Fattaruso, who was the *only* partner at the Firm who regularly worked with Cyrulnik on running the Firm's core matters while the other partners focused primarily on the Firm's contingency work (and small billable matters). Fattaruso was deliberately and unjustifiably excluded so that the Conspiring Partners could falsely mischaracterize the vote to oust Cyrulnik as "unanimous," when in fact, they did not even include two of the Firm's seven equity partners (constituting almost 30% of the Firm's equity votes).

72.     The secret meeting not only breached the fiduciary duties owed by the Conspiring Partners to Cyrulnik, but directly breached the MOU. As the Firm's co-chairperson, only Cyrulnik (together with Freedman, the other co-chairperson) could "call the firm's meetings to order," and Cyrulnik (together with Freedman) was also "responsible for the orderly conducting of those meetings." Cyrulnik's right to initiate and conduct Firm meetings could not be altered without "the affirmative vote of 100% of the Firm's Founding Partners," including Cyrulnik, which of course never happened.

73.     Two days after the meeting, on February 12, 2021, the Conspiring Partners sent Cyrulnik an email informing him that he was "removed," which email was riddled with errors, misstatements, and mischaracterizations, purporting to remove Cyrulnik from the Firm for

33

"cause." The fictitious bases set forth in the email had not even occurred, much less constituted proper "cause" as required.

## IX. COUNTERCLAIM-DEFENDANTS BREACHED THE MOU AND THEIR FIDUCIARY OBLIGATIONS TO CYRULNIK AND THE FIRM'S CLIENTS

### A. Counterclaim-Defendants Indisputably Lacked "Cause" To Expel Cyrulnik

74. Counterclaim-Defendants indisputably lacked anything close to "cause" — which, under applicable law, required illegal activity, ethical breaches, or utter abandonment or dereliction of his job — to remove Cyrulnik.

75. Prior to joining the Firm, Cyrulnik spent his past 15 years at BSF, rising from associate to partner to equity partner as quickly as anyone in BSF's history. All of the Firm's equity partners, including all of the Conspiring Partners, had worked for years at BSF with Cyrulnik. He had never before had any complaints lodged against him for any improper interactions with any colleague — associate, partner, or otherwise. Cyrulnik is highly respected by scores of colleagues with whom he works and has worked. Because there was no record of misconduct and, of course, no actual misconduct, the Conspiring Partners had no substance upon which to base their pretextual removal for cause. Instead, they contrived a removal email that not only was false and devoid of substance, but failed to describe any actual cause.

76. For example, Counterclaim-Defendants' purported "removal" email asserts that Cyrulnik screamed, "spoke over" other partners, refused to listen, and was antagonistic at meetings. Setting aside that "screaming" cannot and does not constitute cause, it in any event mischaracterizes two instances of disagreement about Firm decisions throughout *14 months* of Cyrulnik's tenure. For example, in July 2020, rather than engage Cyrulnik in substantive conversation about the critical Firm issue of Freedman's manipulation of the Compensation Model, Roche and Freedman hung up on Cyrulnik and coordinated matching e-mails, alleging

Cyrulnik had "screamed" at them, accompanied by a misleading account of events. These emails were a misguided effort to pressure Cyrulnik into conceding financial rights. When Roche and Freedman realized that Cyrulnik would not be intimidated by such bullying tactics, the emails ceased.

77. The other allegations in the email are equally misguided. The email vaguely asserts that Cyrulnik "attempt[ed] to undermine the intent of the MOU and marginalize other founding partners." Yet, it provides no context or support for these accusations (because they are false). And the email includes a vague and nebulous accusation that Cyrulnik created "unsustainable environments for associates," which is completely false. To the contrary, Cyrulnik is not aware of a single associate at the Firm, or with whom he has ever worked, who has spoken ill of him or working for him.

78. As the removal email evidences, the actions by the Conspiring Partners are about one thing only: greed. They had no problem working with Cyrulnik at BSF — actively recruiting him to leave his hard-earned position and lead the Firm — and no problem working with Cyrulnik at the Firm (and reaping the benefits of his substantial and stable client and revenue base) until ▮▮▮▮ days before his removal when his assets skyrocketed in value and the Tokens suddenly appreciated to more than $60 million in value. Then, without any precipitating incident, the Conspiring Partners felt compelled to act on an emergency basis, without notice to Cyrulnik or other partners or an opportunity for him to respond to their pretextual and baseless allegations.

79. Following their wrongful attempted removal of Cyrulnik, the Conspiring Partners have stopped at nothing in their quest to defame him. In a truly cynical effort, the Conspiring Partners attempted to exploit the legal community's rightful concerns over diversity and

inclusion, and paint Cyrulnik as indifferent to such concerns, solely in an effort to benefit themselves — *i.e.*, five white males.  Cyrulnik has never expressed anything other than outright support for diversity and inclusion efforts in the legal community, both at BSF and at the Firm, and any allegations to the contrary by the Conspiring Partners are manifestly false.

80.     Accordingly, after receiving the Conspiring Partners' email on February 12, 2021, Cyrulnik expressly placed the Conspiring Partners on notice that their purported removal was "in bad faith," in breach of their "contractual and fiduciary obligations to Mr. Cyrulnik and the firm's clients," and that they would be held "liable for any resulting damage to Mr. Cyrulnik or his clients."

### B.     The Conspiring Partners Breached The MOU By Denying Cyrulnik The Compensation They Agreed To Pay Him, Regardless Of Any Purported Removal For Cause

81.     The Conspiring Partners' scheme suffered from many fatal flaws, including the threshold problem that, even where partners have grounds for removing a Founding Partner for cause (there were none here) and the proper procedures for doing so were followed (again not the case here), such a removal would not impact Cyrulnik's core compensation rights under the MOU in any event.

82.     In Section VI of the MOU ("Firm Management"), the MOU addressed two different instances where a Founding Partner would depart from the Firm.  The partner could withdraw voluntarily under Section VI(C), or under limited circumstances could be removed involuntarily for cause under Section VI(G).

83.     In their complaint, the Conspiring Partners intentionally sought to conflate the provisions in a misguided attempt to treat their improper and *involuntary* removal as Cyrulnik deciding to "withdraw" from the Firm.  In so doing, they ignore the plain language of the MOU, the caselaw that uniformly interprets "withdrawal" as requiring a voluntary act and treats an

involuntary removal and voluntary withdrawal separately, and the intent of the parties (including

the Founding Partner's desire to preserve their financial and equity stakes unless they voluntarily

agreed to change their economics).

84.     The MOU unambiguously provides for certain ramifications in the event of

voluntary withdrawal.  It unequivocally does *not* set forth those ramifications for involuntarily

removal, and Counterclaim-Defendants' attempt to do so is baseless and improper.

## X.     THE CONSPIRING PARTNERS' SUBSEQUENT CONDUCT HAS HARMED AND CONTINUES TO HARM CYRULNIK AND HIS CLIENTS

85.     Since perpetrating their scheme and purporting to remove Cyrulnik as a partner,

the Conspiring Partners have egregiously breached their duties to and badly mistreated the

Firm's clients, seeking to pressure them to stay with the Firm and then punishing them for

choosing to follow Cyrulnik.  Despite the Conspiring Partners' extreme efforts to keep the

Firm's clients at RCF, every single client that Cyrulnik brought to the Firm left the Firm and

remained with Cyrulnik.

### A.     The Conspiring Partners Seek To Pressure Cyrulnik To Forfeit Certain Of His Assets

86.     After sending Cyrulnik their "removal" email, the Conspiring Partners tried to

pressure him to agree to sign a confidential mediation and binding arbitration agreement to

facilitate an "amicable" re-division of his assets and rights under the MOU.  After calling out the

Conspiring Partners' improper scheme, Cyrulnik told the Conspiring Partners that a necessary

predicate for any discussion about splitting the Firm was their commitment to provide him all of

the compensation he is owed under the MOU.

87.     On February 19, Roche sent Cyrulnik a proposal in which he proposed that

Cyrulnik give the Conspiring Partners 75% of his Tokens.  Through his counsel, Cyrulnik told

the Conspiring Partners that, if they did not commit to providing Cyrulnik everything to which

he is entitled pursuant to the MOU and Side Letter, including his 25% share of the Tokens, Cyrulnik would be forced to commence litigation. The Conspiring Partners' counsel stated that his clients were looking to resolve the matter, and that he would speak with them and revert on Sunday morning, February 28, 2021.

88. Having forestalled litigation through that stall tactic, the Conspiring Partners rushed to prepare their own anticipatory pleading and rushed into court, in the hope that publicizing a false narrative would force Cyrulnik to give them what they wanted and would enable the Conspiring Partners to keep Cyrulnik's clients. Without providing any further response to Cyrulnik, the Counterclaim-Defendants filed a declaratory relief lawsuit in this Court on the night of Saturday, February 27, 2021 (a day before the scheduled call between their counsel and Cyrulnik's counsel, pursuant to Counterclaim-Defendants' counsel's request).

89. Concurrent with their late-night filing, the Conspiring Partners suddenly cut Cyrulnik's access to client files without notice. At the time, Cyrulnik was lead counsel on many active matters with a number of court hearings and depositions scheduled the next business day and throughout the ensuing week, and the Conspiring Partners' actions materially hindered Cyrulnik's ability to work on these matters – as the Conspiring Partners intended all along, as further leverage to force Cyrulnik to give up his rights. Cyrulnik rejected the Conspiring Partners' extortionate actions, and demanded that his access to client files be restored so that he could continue representing and protecting the interests of his clients – clients who, at the time, remained Firm clients to whom each of the Conspiring Partners owed fiduciary duties. Ultimately, the Conspiring Partners agreed to provide Cyrulnik access to his clients' files – although only after he was forced to scramble and waste significant time and effort to protect client interests.

**B.**     **The Conspiring Partners Seek To Pressure Clients To Sign New Engagement Letters And Then Punish Them For Choosing Cyrulnik**

90.     Faced with the imminent prospect of losing most of their core clients and revenue, the Conspiring Partners sought to leverage deadlines in active matters to pressure clients to execute new engagement letters with the Firm or else be left without adequate staffing for their matters on virtually no notice at all. Indeed, in many cases, the Counterclaim-Defendants' letters to clients demanded responses within just a few business *hours*.

91.     When the clients informed the Firm that they wanted Cyrulnik to lead their matters but expected an appropriate and non-prejudicial transition of their active matters, the Firm scrambled to punish those clients by rapidly removing the associates who had been staffed on those cases for months – with imminent deadlines fast approaching and against the request and recommendation of the other Firm partner who had been running the cases with Cyrulnik (and who remained at the Firm at the time).

92.     The Counterclaim-Defendants also enlisted newly hired partner, Eric Rosen, to send harassing letters to clients, in which Rosen threatened to file notices of withdrawal in less than two days' time – whether the clients like it or not – "[i]n light of your choice for Mr. Cyrulnik to continue handling your matter." Cyrulnik continued to field daily phone calls for weeks from clients who were receiving Rosen's emails threatening to prejudice their cases by filing withdrawal notices in their active cases.

93.     Even after the Conspiring Partners resigned themselves to the fact that Cyrulnik's clients had no interest in being represented by RCF unless Cyrulnik was leading their cases, they sought to harm those clients by generating and demanding payment of inaccurate and improper invoices, and refusing to remit client funds that did not belong to them. Specifically, the Conspiring Partners drafted invoices for those clients without the input or oversight of any of the

39

partners who oversaw the matter, and demanded that Cyrulnik sign off on them without review. When Cyrulnik told the Conspiring Partners that client invoicing needed to be done carefully and properly and that he needed access to Firm timekeeping and recording systems to perform his customary review of pre-bills before they were sent out to clients, the Conspiring Partners refused.

94. Cyrulnik's counsel called out Counterclaim-Defendants' attempt to mistreat clients:

> Any effort to send bills to clients without the lead partner overseeing those matters reviewing them is obviously improper. Client bills need to be reviewed before they are sent out, as clients reasonably expect to happen. The fact that these clients declined to have your clients represent them going forward does not change that. If you want to treat clients properly and fairly, we have offered a process for doing so. If your clients desire to punish clients for declining to be represented by the kinds of people you represent, we strongly oppose such efforts and will obviously not facilitate them. We have proposed a mechanism for dealing with invoicing; if you refuse to approach that effort in a manner consistent with your clients' duties to their former clients and to mine, we will address that in court.

95. Confronted with this reality, Counterclaim-Defendants then partially backtracked, demanding that Cyrulnik send "corrections" to the invoices based on guesswork and memory alone, without access to the firm timekeeping systems, calendars and records or to the lawyers whose time was being listed on the bills, and that he do so within two business days. The Conspiring Partners also demanded that Cyrulnik send them entries for the time *he* worked on all matters in January and February so that they could include those entries on the improper invoices, which would enable them to give clients the false impression that Cyrulnik had signed off on the invoices and the work being billed. Although it was against Cyrulnik's own financial interests, he declined to participate in the Conspiring Partners' effort to bill clients without

customary and proper review of the invoices to ensure accuracy and that clients were being treated fairly and honestly.

96.     *To this day*, despite multiple requests and demands, the Conspiring Partners continue to block Cyrulnik's access to the billing systems needed to send out proper invoices, causing substantial harm to Cyrulnik.

97.     Astonishingly, in its Amended Complaint, RCF somehow tries to turn these facts on their head, alleging that *Cyrulnik* breached his duties to the Firm by not participating in its plan to send out invoices without customary and requisite review, to bill clients for unauthorized work, and to create the false impression for clients that the invoices had been properly reviewed and approved – when it is the Conspiring Partners who have unilaterally and improperly blocked Cyrulnik's access to the records necessary to ensure that the Conspiring Partners do not send out false or fraudulent invoices.  The Conspiring Partners then feign ignorance in their Amended Complaint as to why the many clients they so badly mistreated – and whose cases the Conspiring Partners endangered through their bad-faith, retaliatory conduct – apparently did not pay the invoices that RCF sent.

**C.     The Conspiring Partners Cause the Firm To Disseminate
        False Tax Forms In An Effort To Further Their Scheme.**

98.     Recognizing that their scheme had been exposed, the Conspiring Partners scrambled to devise a backup plan for stealing Cyrulnik's assets in mid-2021.

99.     Specifically, they secretly directed the Firm's accountant to withhold Cyrulnik's Form K-1 – the tax form utilized by partners in lieu of a Form W-2 – and then issued him a falsified W-2 form, claiming that Cyrulnik – the Firm's largest equity holder at 27% – would suddenly and retroactively being recharacterized as an *employee* of the Firm.

100.     Upset that Fattaruso declined to support their scheme, the Conspiring Partners then denied Fattaruso's status as an equity partner and falsified his tax forms, seeking to punish him for being honest and refusing to endorse their unethical and illegal behavior.

101.     The Conspiring Partners then reallocated to themselves Cyrulnik's allocated expenses in connection with starting the Firm and its operations, and on information and belief, filed false tax returns with the federal and local authorities claiming deductions to which they were not entitled and mischaracterizing income received by individual partners.

102.     The Conspiring Partners then used Cyrulnik's funds to keep the Firm afloat in the face of the mass exodus of clients and refused to remit large amounts of compensation owed to Cyrulnik for months.  Then, in April 2021, Counterclaim-Defendants finally, and belatedly, sent a portion of the amounts owed but improperly withheld the rest of Cyrulnik's assets (and continue to do so to this day).  In violation of the express provisions of the MOU and the controlling Florida statutes governing the partnership, the Conspiring Partners sought to obscure their misconduct by withholding from Cyrulnik basic information about the Firm's accounts and revenues in which he held substantial interests, never paying him the rest of his formula compensation or any of the equity distributions owed to him, and misappropriating the other assets given to him under the MOU, including his Tokens and his 25% interest ███ ██████████████████████████ in a $100 million jury award, with which Freedman publicly claimed he was "thrilled" (shortly before filing an appeal of the decision).

### COUNT 1
**(Dissolution pursuant to Florida Statutes § 620.8801)**

103.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 102 herein.

104. Cyrulnik seeks judicial dissolution of RCF pursuant to Florida Statutes §§ 620.8405 and 620.8801.

105. RCF is a limited liability partnership, as defined by the Florida Revised Uniform Partnership Act, and as governed by the MOU.

106. Counterclaim-Defendants breached the MOU by purporting to remove Cyrulnik as a partner of RCF, notwithstanding that they lacked cause to do so. The purported "cause" cited by Counterclaim-Defendants is plainly insufficient as a matter of law, indisputably pretextual, in bad faith and based on lies and mischaracterizations of the events. Accordingly, the Conspiring Partners lacked the authority to remove Cyrulnik as a partner, and their attempt to do so, as well as any and all actions they have taken based on and/or in reliance on their purported removal of Cyrulnik, breached the MOU and is ultra vires and void *ab initio*. Accordingly, Cyrulnik remains a Founding Partner and Co-Chairperson of RCF.

107. Pursuant to the Parties' MOU, Cyrulnik is entitled to various financial and management rights in RCF.

108. By virtue of the Conspiring Partners' improper removal of Cyrulnik, deprivation of his management and financial rights, and additional misconduct as set forth above, the economic purpose of the partnership has been unreasonably frustrated by the actions of the Conspiring Partners, and likely will continue to be unreasonably frustrated, within the meaning of Florida Statutes § 620.8801(5)(a).

109. By virtue of the Conspiring Partners' improper removal of Cyrulnik, deprivation of his management and financial rights, and additional misconduct as set forth above, it is not reasonably practicable for Cyrulnik to carry on the business in partnership with the Conspiring Partners, within the meaning of Florida Statutes § 620.8801(5)(b).

43

110.     By virtue of the Conspiring Partners' improper removal of Cyrulnik, deprivation of his management and financial rights, and additional misconduct as set forth above, it is not reasonably practical to carry on the activities of the limited liability partnership in conformity with the MOU, within the meaning of Florida Statutes § 620.8801(5)(c).

111.     Cyrulnik is entitled to recover his reasonable attorney's fees in this action.

112.     By reason thereof, Cyrulnik respectfully requests that this Court enter a judgment dissolving Roche Cyrulnik Freedman LLP (a/k/a Roche Freedman LLP), a Florida limited liability partnership; directing that within a reasonable period of time RCF wind up its activities in accordance with Florida Statutes §§ 620.8801-8807; directing that Cyrulnik shall participate in the winding up of RCF's activities; ordering judicial supervision of the winding up, including the appointment of a receiver to wind up RCF's activities and settle the accounts of RCF; granting him reasonable attorneys' fees and costs; and for such other relief in law or equity as may be just and proper.

## COUNT 2
### (Buyout under Florida Statutes § 620.8701 in the Alternative)

113.     Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 112 herein.

114.     RCF is a limited liability partnership, as defined by the Florida Revised Uniform Partnership Act, and as governed by the MOU.

115.     Cyrulnik is a Founding Partner of RCF, a 27% equity holder, and the Co-Chairperson of RCF.

116.     Pursuant to the Parties' MOU, Cyrulnik is entitled to various financial and management rights in RCF.

117. Should judicial dissolution be found inappropriate or inequitable, in the alternative, the Conspiring Partners' actions to expel Cyrulnik from RCF entitle him to a buyout pursuant to Florida Statutes § 620.8701.

118. Cyrulnik is entitled to recover his reasonable attorney's fees in this action.

119. By reason thereof, in the alternative to dissolution, Cyrulnik respectfully requests that this Court determine, and enter judgment awarding Cyrulnik, the proper value of his interest in RCF, pursuant to Florida Statutes § 620.870, together with accrued interest, costs and reasonable attorneys' fees, and such other relief in law or equity as the Court finds just and proper.

## COUNT 3
### (Accounting Pursuant to Florida Statutes §§ 620.8403 and 620.1407)

120. Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 119 herein.

121. The Conspiring Partners have taken control of RCF, have unlawfully excluded Cyrulnik, have failed and refused to provide Cyrulnik access to the books and records of the Firm, have failed to account for the revenues and expenses of the Firm, have failed and refused to allow Cyrulnik any say in the operation of RCF, and have otherwise abused their status as partners of the Firm.

122. An accounting of the assets, profits, and losses of RCF is necessary and appropriate at this time.

123. Florida Statutes § 620.8403 requires a limited liability partnership to provide its current (and former) partners access to the Firm's records that are required to be kept by all limited liability partnerships. Florida Statutes § 620.1407 affords a current (and former) partner

the right to inspect and copy and "records maintained by the limited liability partnership

regarding the limited partnership's activities and financial condition."

    124.    Cyrulnik has been denied access to RCF's books and records notwithstanding

numerous requests for access to the Firm's financial records and accounts.

    125.    By reason thereof, Cyrulnik demands judgment in his favor, requiring

Counterclaim-Defendants to account to Cyrulnik for the income, expenses, assets, and liabilities

of RCF from inception through present; find and determine the amount due to Cyrulnik from

RCF; and enter a judgment or decree in favor of Cyrulnik for his compensatory damages,

prejudgment interest, cost, and such further relief as this Court deems just and proper.

### COUNT 4
### (Breach of Contract)
### (Against the Conspiring Partners)

    126.    Cyrulnik repeats and realleges each and every allegation contained in

paragraphs 1 through 125 herein.

    127.    The MOU is a valid and binding agreement between Cyrulnik and the Conspiring

Partners.

    128.    The Side Letter is a valid and binding agreement between Cyrulnik, Roche and

Freedman.

    129.    Cyrulnik has fully performed and is ready, willing, and able to continue to

perform his obligations under the MOU and the Side Letter.

    130.    The Conspiring Partners breached the MOU by, among other things, purporting to

remove Cyrulnik as a partner of RCF, notwithstanding that they lacked cause to do so.  The

"cause" cited by Counterclaim-Defendants was indisputably pretextual, in bad faith, based on

Counterclaim-Defendants' lies and mischaracterizations of the events, and in any case did not

rise to the level of "cause" under the law.  Accordingly, the Conspiring Partners did not have the

authority to remove Cyrulnik as a partner, and their attempt to do so, as well as any and all actions they have taken based on and/or in reliance on their purported removal of Cyrulnik, breached the MOU.

131.     Even if the Conspiring Partners had "cause" to expel Cyrulnik from the Firm, the Conspiring Partners further breached the MOU and Side Letter by refusing to provide to Cyrulnik, and/or denying Cyrulnik's entitlement to, his substantial ownership interests imparted to him under the MOU, including but not limited to Cyrulnik's 25% interest in the Tokens, and 27% of the Firm's equity.  Although the MOU limits the ability of a partner who has *withdrawn* from the Firm to retain his equity, it does not provide any such limitation on a partner who was *removed*.  Accordingly, by citing the MOU withdrawal provision as a basis for depriving Cyrulnik of his equity interests in RCF, the Conspiring Partners have breached their obligations under the MOU.

132.     Roche further breached the Side Letter by failing to pay Cyrulnik three of the four installment payments owed under the $850,000 payment provision set forth in the Side Letter.

133.     The Conspiring Partners unilaterally changed the Firm's website, letterhead, and formal firm name to "Roche Freedman LLP" without Cyrulnik's authorization, in blatant breach of Section F of the MOU, which expressly requires Cyrulnik's consent for any change to the Firm's name.

134.     Conspiring Partners Roche and Freedman breached Section N of the MOU, which expressly requires that "Jason Cyrulnik will have full access to the Firm's bank accounts." Roche and Freedman failed to provide such full access prior to the unlawful removal event, and then proceeded to shut down all of Cyrulnik's access without notice in February 2021.

135. The Conspiring Partners also breached the MOU by not performing multiple obligations set forth therein and then disclaiming that the MOU was fully effective because those steps had not yet been completed.

136. The Conspiring Partners' conduct, as described above, is outrageous, intentional, malicious, willful, and in blatant or reckless disregard of Cyrulnik's rights.

137. By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**COUNT 5**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
**(Against the Conspiring Partners)**

138. Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 137 herein.

139. The MOU is a valid and binding agreement between Cyrulnik and the Conspiring Partners.

140. The Side Letter is a valid and binding agreement between Cyrulnik, Roche and Freedman.

141. Implicit in every contract, including the MOU and the Side Letter, is an implied covenant of good faith and fair dealing.

142. The Conspiring Partners breached this implied covenant by, among other things, taking actions that were designed to, and did, deprive Cyrulnik of the benefits to which he is entitled under the MOU and the Side Letter, including by improperly and in bad faith contriving a false definition of "cause" to purportedly remove Cyrulnik, refusing to provide to Cyrulnik,

48

and/or denying Cyrulnik's entitlement to his substantial equity interests in RCF and RCF's assets, including but not limited to Cyrulnik's 25% interest in the Tokens and 27% of the Firm's equity, and by denying Cyrulnik access to files, documents, Firm bank accounts, and other information necessary for Cyrulnik to adequately represent and protect the legal interests of his clients.

143.    The Conspiring Partners also breached the covenant of good faith and fair dealing by not performing multiple obligations set forth therein in the MOU and then disclaiming that the MOU was fully effective because those steps had not yet been completed.

144.    By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

### COUNT 6
**(Breach of Fiduciary Duty)**
**(Against the Conspiring Partners)**

145.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 144 herein.

146.    As partners in a professional service limited liability partnership, the Conspiring Partners at all relevant times owed, and still owe, fiduciary duties to Cyrulnik.  These duties include the duties of care and loyalty.

147.    The Conspiring Partners breached their fiduciary duties to Cyrulnik by, among other things, (i) conspiring to remove Cyrulnik as a Firm partner; (ii) preventing Cyrulnik from exercising his management rights in RCF; (iii) depriving Cyrulnik of his financial rights in RCF and failing to hold as trustee for the partnership property and profit, including without limitation

Cyrulnik's 25% interest in the Tokens; (iv) self-dealing; (v) purporting to remove Cyrulnik as a

Firm partner without legal grounds to do so; (vi) interfering with Cyrulnik's ability to practice

law and protect the legal interests of Firm clients; and (vii) denying Cyrulnik access to files,

documents, Firm bank accounts, and other information necessary for Cyrulnik to adequately

represent and protect the legal interests of his clients.

148.     By reason thereof, Cyrulnik demands judgment against the Conspiring Partners,

jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be

determined at trial, including the value of his equity interest in the Firm (inclusive of his equity

interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such

other and further relief that this court deems to be just and proper.

### COUNT 7
### (Conversion)

149.     Cyrulnik repeats and realleges each and every allegation contained in

paragraphs 1 through 148 herein.

150.     Counterclaim-Defendants knowingly and intentionally converted Cyrulnik's

specific and identifiable membership interest in RCF and his substantial equity interests in RCF

and RCF's assets, including but not limited to Cyrulnik's 25% interest in the Tokens, which

belong solely to Cyrulnik, without Cyrulnik's consent and without compensation to Cyrulnik.

151.     Counterclaim-Defendants, without authority, deprived Cyrulnik of such

membership interest and substantial equity interest for their own use.

152.     Counterclaim-Defendants' deprivation of Cyrulnik's partnership and equity

interests is adverse and inconsistent with Cyrulnik's rights and ownership interest in RCF.

153. Counterclaim-Defendants have refused Cyrulnik's demand that they restore his partnership status and return his equity interests. Moreover, at this point, a demand and refusal are unnecessary because they would be futile.

154. As a direct and proximate result of Counterclaim-Defendants' conversion, Cyrulnik has suffered damages.

155. By reason thereof, Cyrulnik demands judgment against Counterclaim-Defendants, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

## COUNT 8
### (Unjust Enrichment)

156. Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 155 herein.

157. Through his service to RCF, including his client generation and the substantial time and attention he provided to Firm matters, Cyrulnik conferred a benefit on RCF and its partners, including the Conspiring Partners.

158. Counterclaim-Defendants had full knowledge of, voluntarily accepted, and retained the benefit conferred by Cyrulnik. Indeed, Counterclaim-Defendants relied on the benefit provided by Cyrulnik for the Firm's very survival.

159. The circumstances are such that it would be inequitable for Counterclaim-Defendants to retain the benefit without first paying the value thereof to Cyrulnik, including but not limited to Cyrulnik's 25% interest in the Tokens.

160.    Cyrulnik is entitled to damages as a result of Counterclaim-Defendants' unjust enrichment, including the disgorgement of all benefits unlawfully accepted by Counterclaim-Defendants from Cyrulnik.

161.    By reason thereof, Cyrulnik demands judgment against Counterclaim-Defendants, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

## COUNT 9
### (Promissory Estoppel)
### (Against the Conspiring Partners)

162.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 161 herein.

163.    The Conspiring Partners made a clear and unambiguous promise to pay Cyrulnik certain amounts and to remit to him interests in many assets – including but not limited to 25% ▮▮▮▮▮▮▮▮▮▮▮▮ of all Tokens issued by the Startup Client (which value has exceeded $400 million) and 27% of RCF's profits including from its contingency interests in various litigations – and to impart to him certain control rights, along with several other assets the parties listed.  They did so to induce Cyrulnik to give up his long-standing equity partnership and other lucrative opportunities and leverage his reputation, experience, and substantial practice to co-found RCF.

164.    Conspiring Partners Roche and Freedman made a clear and unambiguous promise to pay Cyrulnik the amounts set forth in the Side Letter, including 25% of their interest in ▮▮▮▮▮▮▮▮▮▮▮▮ a $100 million jury award with which Freedman publicly claimed he was "thrilled" (shortly before filing an appeal of the decision), and an

$850,000 cash payment to induce Cyrulnik to allow Roche to list his name before Cyrulnik's and proceed with co-founding the Firm as RCF.

165.    Cyrulnik reasonably and foreseeably relied on the foregoing promises the Conspiring Partners made by, among other things, leaving his lucrative practice at BSF, foregoing the opportunity to work at various other law firms, and spending the next year servicing clients at RCF.

166.    The Conspiring Partners caused unconscionable injury to Cyrulnik by breaking those promises, misappropriating the foregoing assets for their own benefit, and refusing to remit his assets or honor the guaranteed rights he had been promised.

167.    The Conspiring Partners' conduct, as described above, is outrageous, intentional, malicious, willful, and in blatant or reckless disregard of Cyrulnik's rights.

168.    By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

**COUNT 10**
**(Civil Conspiracy)**
**(Against the Conspiring Partners)**

169.    Cyrulnik repeats and realleges each and every allegation contained in paragraphs 1 through 168 herein.

170.    The Conspiring Partners are parties to a civil conspiracy.

171.    The Conspiring Partners conspired with each other to commit unlawful acts by unlawful means, including (i) improperly removing Cyrulnik as a Firm partner; (ii) preventing Cyrulnik from exercising his management rights in RCF; (iii) depriving Cyrulnik of his financial

rights in RCF and failing to hold as trustee for the partnership property and profit, including without limitation Cyrulnik's 25% interest in the Tokens; (iv) self-dealing; (v) purporting to remove Cyrulnik as a Firm partner without legal grounds to do so; (vi) interfering with Cyrulnik's ability to practice law and protect the legal interests of Firm clients; and (vii) denying Cyrulnik access to files, documents, Firm bank accounts, and other information necessary for Cyrulnik to adequately represent and protect the legal interests of his clients.

172.    Each of the Conspiring Partners committed an over act in furtherance of their conspiracy, including but not limited to, their affirmative vote on February 10, 2021 to remove Cyrulnik as a Firm partner in violation of the MOU and their fiduciary duties.

173.    As a direct and proximate result of the Conspiring Partners' civil conspiracy, Cyrulnik has suffered damages.

174.    By reason thereof, Cyrulnik demands judgment against the Conspiring Partners, jointly and severally, and awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of his equity interest in the Tokens), as well as interest, costs and attorneys' fees, punitive damages, and such other and further relief that this court deems to be just and proper.

### TRIAL BY JURY

Trial by jury is demanded on all issues so triable.

### REQUEST FOR RELIEF

WHEREFORE, Cyrulnik demands a judgment against Counterclaim-Defendants:

(a)     on Count One, dissolving Roche Cyrulnik Freedman LLP (a/k/a Roche Freedman LLP), a Florida limited liability partnership; directing that within a reasonable period of time RCF wind up its activities in accordance with Florida Statutes §§ 620.8801-8807; directing that Cyrulnik shall participate in the winding up of RCF's activities; and ordering judicial

supervision of the winding up, including the appointment of a receiver to wind up RCF's activities and settle the accounts of RCF;

(b)    on Count Two, in the alternative to dissolution, awarding Cyrulnik the proper value of his interest in RCF, pursuant to Florida Statutes § 620.870;

(c)    on Count Three, requiring Counterclaim-Defendants to account to Cyrulnik for the income, expenses, assets, and liabilities of RCF from inception through present, as well as the amount due to Cyrulnik from RCF;

(d)    on Counts Four through Six and Nine through Ten, against the Conspiring Partners, jointly and severally, awarding Cyrulnik his compensatory damages in an amount to be determined at trial, including the value of his equity interest in the Firm (inclusive of the Tokens and other assets owed to him);

(e)    on Counts Five through Ten, awarding Cyrulnik punitive damages;

(f)    on Counts Four through Ten, prejudgment and post-judgment interest at the maximum possible rate;

(g)    Cyrulnik's costs in the prosecution of this action, including reasonable attorneys' fees; and

(h)    such other and further relief as is just and proper.

Dated: New York, New York
February 25, 2022

KASOWITZ BENSON TORRES LLP

By: _/s/ Marc E. Kasowitz_____
    Marc E. Kasowitz
    Gavin D. Schryver
1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
Fax: (212) 506-1800
Email: mkasowitz@kasowitz.com
        gschryver@kasowitz.com

*Attorneys for Defendant/Counterclaim-Plaintiff
Jason Cyrulnik*